IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Isaiah F. Walker, | ) | Civil Action No.:2:15-cv-02174-RBH-MGB |
| | ) | |
| Petitioner, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| v. | ) | **OF MAGISTRATE JUDGE** |
| | ) | |
| Warden Cecelia Reynolds, | ) | |
| | ) | |
| Respondent. | ) | |

The Petitioner, a state prisoner, seeks habeas relief pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Respondent's Motion for Summary Judgment. (Dkt. No. 14; *see also* Dkt. No. 13.)

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(c), D.S.C., this magistrate judge is authorized to review the instant petition for relief and submit findings and recommendations to the District Court.

The Petitioner, through counsel, brought the instant habeas action on May 28, 2015. (Dkt. No. 1; Dkt. No. 1-1.) On September 23, 2015, Respondent filed a Motion for Summary Judgment. (Dkt. No. 14; *see also* Dkt. No. 13.) Petitioner filed a Response in Opposition to the Motion for Summary Judgment on January 27, 2016. (Dkt. No. 25.) For the reasons set forth herein, the undersigned recommends granting Respondent's Motion for Summary Judgment (Dkt. No. 14.)

## PROCEDURAL HISTORY

The Petitioner is currently confined within the South Carolina Department of Corrections ("SCDC"). In February of 2007, the Spartanburg County Grand Jury indicted Petitioner for murder. (*See* R. at 729-30.) Plaintiff was represented by Rodney Richey, Esquire, and Caroline Holsbeck, Esquire. (*See* R. at 43.) Petitioner proceeded to a jury trial before the Honorable Roger Couch on May 29-31 of 2007. (*See* R. at 43-697.) On May 31, 2007, the jury convicted Petitioner as charged, and Judge Couch sentenced Petitioner to life in prison. (*See* R. at 691, 696.)

1

Petitioner appealed and was represented by Rodney W. Richey, Esquire. (*See* Dkt. No. 13-7 at 1 of 15.) On October 3, 2008, Mr. Richey filed an *Anders*[1] Brief of Appellant, wherein he raised the following issue: "Whether the trial judge erred in not granting the Appellant's motion for direct verdict at the close of the State's case." (Dkt. No. 13-7 at 4 of 15.) In an unpublished opinion filed on February 11, 2010, the South Carolina Court of Appeals dismissed the appeal. (*See* R. at 713-14.) The matter was remitted to the lower court on March 4, 2010. (R. at 715.)

On October 6, 2010, Petitioner filed an application for post-conviction relief ("PCR"). (R. at 716-22.) The following questions and answers appeared in his PCR application:

10. State concisely the grounds on which you base your allegation that you are being held in custody unlawfully:

(a) The Applicant received Ineffective Assistance of Counsel prior and during his jury trial in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 14 of the South Carolina Constitution.

(b) The Applicant received Ineffective Assistance of Appellate Counsel in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 14 of the South Carolina Constitution.

11. State concisely and in the same order the facts which support each of the grounds set out in (10):

(a) Trial counsel failed to provide client effective assistance of counsel prior to and during his trial proceeding inasmuch as Counsel failed to recognize errors which occurred during his trial, and therefore, failed to make appropriate objections, and supporting legal arguments thereto. Counsel's failure to make these objections may have changed the outcome of the Applicant's trial and deprived him of the opportunity to have these issues addressed on their merits on direct appeal.

(b) Trial counsel filed a direct appeal on behalf of the Applicant and proceeded to file a no merit brief pursuant to Anders v. United States despite the fact that he was retained in this case.

---

[1] *See Anders v. California*, 386 U.S. 738 (1967).

2

(R. at 718.)

On September 6, 2012, Petitioner filed an amended application for PCR. (R. at 770-71.)

Therein, Petitioner raised the following allegations of ineffective assistance of counsel:

1. Trial counsel was ineffective for failing to object to testimony from Captain Jackie Kellett, an expert in the area of latent finger print identification, wherein the witness testified that her conclusion concerning the match of a latent palm print to the Applicant had "been verified by a second latent print examiner in my office" where said testimony constituted hearsay and violated the Applicant's right of confrontation.

2. Trial counsel was ineffective for neglecting to present as a witness for the defense, Amanda Murphy, where her testimony would have been crucial to the defense inasmuch as she would have refuted the contention of Brent Gentry that the deceased was killed by the Applicant because he was "messing with Amanda."

3. Trial counsel was ineffective for neglecting to present testimony from Cynthia Thacker where trial counsel was made aware prior to trial that this witness could refute the testimony of Applicant's co-defendant concerning his whereabouts and activities on the morning of the shooting.

4. Trial counsel was ineffective for failing to present testimony from Kenneth Foster where his testimony would have refuted claims made by State witness Raymond Annas and where this witness was made known to defense counsel prior to the trial.

5. Trial counsel was ineffective for providing the Applicant less than reasonable professional assistance of counsel where he failed to fully and accurately advise the Applicant on the crucial question as to whether he should testify in his own defense at trial.

6. The Applicant has it upon information and belief that trial counsel neglected to convey to him and fully discuss with him two plea offers made by the State prior to trial.

7. Trial counsel was ineffective for misleading the Applicant concerning the strength of the State's case by informing him that a palm print asserted by the State to be a print made in the victim's blood was in fact a palm print with blood splattered on top of it.

8. Trial counsel was ineffective for leading the Applicant to believe that the DNA evidence in this case was inconclusive.

9. Trial counsel was ineffective for failing to fully cross-examination [sic] co-defendant, Brent Gentry, concerning all his pending charges at the time of his testimony at the Applicant's trial.

3

(R. at 770-71.)

On September 6, 2012, an evidentiary hearing was held before the Honorable J. Derham Cole. (R. at 774-904.) Petitioner was present and represented by Tara Shurling, Esquire. (*See* R. at 774.) In an order filed July 15, 2013, Judge Cole denied the application for post-conviction relief and dismissed the petition. (R. at 905-25.)

Petitioner, through his attorney Tara Dawn Shurling, filed a Petition for Writ of Certiorari. (*See* Dkt. No. 13-11.) Through counsel, Petitioner presented the following questions:

1. Did the lower court err in finding that Trial Counsel was not ineffective for failing to object to testimony from Captain Jackie Kellett, an expert in the area of latent finger print identification, wherein the witness testified that her conclusion concerning the match of a latent palm print to the Petitioner had "been verified by a second latent print examiner in my office" where said testimony constituted hearsay and violated the Petitioner's right of confrontation.

2. Did the lower court err in finding that Trial counsel was not ineffective for failing to present as a witness for the defense, Amanda Murphy, where her testimony would have been crucial to the defense inasmuch as she would have refuted the contention of Brent Gentry that the deceased was killed by the Petitioner because he was "messing with Amanda."

3. Did the lower court err in finding that Trial counsel was not ineffective for neglecting to present testimony from Cynthia Thacker where trial counsel was made aware prior to trial that this witness could refute the testimony of the Petitioner's co-defendant concerning his whereabouts and activities on the morning of the shooting.

4. Did the lower court err in finding that Trial counsel was not ineffective for failing to present testimony from Kenneth Scott where his testimony would have refuted claims made by State witness Raymond Annas and where this witness was made known to defense counsel prior to the trial.

5. Did the lower court err in finding that Trial counsel was not ineffective for providing the Petitioner less than reasonable professional assistance of counsel where he failed to fully and accurately advise the Petitioner on the crucial question as to whether he should testify in his own defense at trial.

6. Did the lower court err in finding that Trial Counsel was not ineffective for failing to convey to the Petitioner, and fully discuss with him, two plea offers made by the State prior to trial.

4

7. Did the lower court err in finding that Trial counsel was not ineffective for failing to fully cross-examination [sic] co-defendant, Brent Gentry, concerning all of his pending charges at the time of his testimony at the Petitioner's trial.

(Dkt. No. 13-11 at 3 of 36.)

The South Carolina Supreme Court entered an order denying the petition for a writ of certiorari on October 23, 2014. (Dkt. No. 13-14.) The matter was remitted to the lower court on November 10, 2014. (Dkt. No. 13-15.)

Petitioner then filed the instant habeas petition, wherein he raised the following grounds for review:

**Ground One**: The state courts erred in failing to grant Petitioner relief based upon his allegation that he received ineffective assistance of counsel prior to and during his jury trial, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, where Petitioner met his burden of proof with regard to his allegation that Trial Counsel was ineffective for failing to object to testimony from Captain Jackie Kellett, an expert in the area of latent finger print identification, wherein the witness testified that her conclusion concerning the match of a latent palm print to the Petitioner had "*been verified by a second latent print examiner in my office*" where said testimony constituted hearsay and violated the Petitioner's right to confront all the witnesses against him.

**Ground Two**: The state courts erred in failing to find that Petitioner's right to effective assistance of counsel, as protected by the Sixth and Fourteenth Amendments to the United States Constitution, was violated where Petitioner established on collateral review that Trial [counsel] failed to interview, and secure for presentation at trial, available witnesses whose testimony would have disputed key aspects of the State's case.

**Ground Three**: The state court erred in finding that Trial counsel was not ineffective for providing the Petitioner less than reasonable professional assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, where Petitioner established that Trial Counsel failed to fully and accurately advise the Petitioner on the crucial decision concerning whether he should testify in his own defense at trial.

**Ground Four**: The state court erred in failing to find that Trial Counsel was ineffective, and therefore that Petitioner's right to effective assistance of counsel, as protected by the Sixth and Fourteenth Amendment to the United States Constitution had been violated, when Trial Counsel failed to convey to Petitioner, and fully discuss with him, two plea offers made by the State prior to trial.

5

**Ground Five**: Petitioner asserts that the state court erred in failing to find that Trial counsel was ineffective, and thereby violated his rights pursuant to the Sixth and Fourteenth Amendments, when he failed to fully cross-examination [sic] co-defendant, Brent Gentry, concerning all of his pending charges, and his sentencing exposure on those charges, at the time of his testimony at Petitioner's trial.

(Dkt. No. 1-1 at 3-18 of 20.)

## APPLICABLE LAW

**Summary Judgment Standard**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id*. (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

**Habeas Standard of Review**

Since the Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997); *Breard v. Pruett*, 134 F.3d 615, 618 (4th Cir.1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> 2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 398 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## DISCUSSION

As noted above, Respondent seeks summary judgment in the instant case. (Dkt. No. 14; *see also* Dkt. No. 13.) Before turning to the merits of Petitioner's case, however, the undersigned will briefly review the factual background. On February 17, 2006, Jeffrey Hubbard (the "victim") was shot and killed in Spartanburg County. The victim's body was found in a white Ford that was still running. (R. at 110-30.) A latent palm print was found on the white Ford, and Captain Jackie Kellett, an expert in the area of latent fingerprint identification, testified that the latent palm print in blood was a match to the Petitioner. (R. at 444-45, 456-57.) Deputy David Hogsed testified at the trial that he prepared a crime scene diagram, marking where various items were found, including a pair of Timberland boots and a black sweatshirt, found approximately 25 yards away from the white Ford. (R. at 136-38.) Hogsed further testified that on February 28, 2006, he recovered a pair of red sweat pants from the lake, which was near where the white Ford was found. (R. at 150-52.)

Along with the Petitioner, Brent Gentry was charged with the murder of the victim; Gentry, however, testified for the prosecution. (R. at 520-21.) Gentry testified that on the day in question, he, Petitioner, and the victim were at the Magnolia Apartments. (R. at 526-27.) Gentry testified that he

7

and Petitioner left the Magnolia Apartments together and went to "a trailer in Roebuck." (R. at 528.) Gentry testified that when he and Petitioner arrived at the trailer, the victim was already there. (R. at 528.) When asked what happened at the trailer, Gentry testified that he, Petitioner, and the victim sat "there and smoked." (R. at 529.) Gentry further testified that although he did not know who Petitioner spoke with, Petitioner went outside to talk on his cell phone, and when Petitioner came back inside, Petitioner and the victim had a conversation about a "deal for some weed." (R. at 529.) According to Gentry, Petitioner and the victim were going to buy two pounds of marijuana and resell it to someone else. (R. at 529-30.) Gentry testified that they did not "have the marijuana already." (R. at 530.) Gentry testified that the victim asked questions about this drug transaction, so Petitioner "let [the victim] talk to whoever was supposed to be buying this dope." (R. at 532.)

Gentry then testified that the victim said he had to go to the bank, and the victim drove his car to the bank; Gentry stated that he and Petitioner were in a vehicle following the victim. (R. at 534-36.) According to Gentry, after the victim went in the bank, Petitioner went and got in the car with the victim. (R. at 536-37.) Gentry testified that he left first and went back to the Magnolia Apartments to deliver some pills; he states he saw the victim and Petitioner go in the direction of Petitioner's house. (R. at 537-38.) Gentry further testified that after delivering the pills, he went to Petitioner's house and saw Petitioner at the driver's side of the victim's car. (R. at 539-41.) According to Gentry, Petitioner told Gentry to "follow him," and Petitioner drove the car until it got stuck by a "little pond" on a dead end road. (R. at 543-44.) Gentry indicates that he then saw Petitioner get out of the driver's side of the vehicle, take his clothes (a black sweatshirt, red pants, and some boots) off, and then throw them towards the pond. (R. at 544-45.) Gentry testified that when Petitioner got into the vehicle with Gentry, Petitioner "said that he had to do it" because the victim "thought he was going to get away with messing with Amanda," Petitioner's girlfriend. (R. at 545-46.)

8

Raymond Annas was another witness for the prosecution. Annas testified that he spoke to Petitioner on the telephone on February 17, 2006, the day the victim was shot. (R. at 601.) Annas further testified that during his conversation with Petitioner, Petitioner "wanted [Annas] to do him a favor," and Annas agreed. (R. at 601.) Annas testified that when a male individual called him, Annas told the man that he wanted two pounds of marijuana for $4700, even though Annas did not have the money or intend to purchase the marijuana. (R. at 601-03.)

Having reviewed the factual background of the case, the undersigned now addresses Petitioner's grounds for relief.

## A.    Ground One

Petitioner asserts in Ground One that trial counsel was ineffective for failing to object to testimony from Captain Jackie Kellett, an expert in the area of latent fingerprint identification, that the match of the latent palm print to Petitioner had "been verified by a second latent print examiner in [her] office." (Dkt. No. 1-1 at 3 of 20.) Petitioner asserts this testimony "constituted hearsay and violated the Petitioner's right to confront all the witnesses against him." (*Id.*)

The United States Supreme Court has said that a meritorious ineffective assistance of counsel claim must show two things: first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984). A court's evaluation of counsel's performance under this standard must be "highly deferential," so as to not "second-guess" the performance.   *Id.* at 689.   "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."   *Id.* (internal quotation marks and citation omitted); *see also Bowie v. Branker*, 512 F.3d 112, 119 n.8 (4th Cir. 2008); *Fields v. Att'y Gen. of Md.*, 956 F.2d 1290, 1297–99 (4th Cir. 1992); *Roach v. Martin*, 757 F.2d 1463, 1467 (4th Cir.

9

1985).  In order to establish the second prong of *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A "reasonable probability" has been defined as "a probability sufficient to undermine confidence in the outcome." *Id*. While *Strickland* itself is a deferential standard, when both § 2254(d) and *Strickland* apply, "review is doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011).  Indeed, when § 2254(d) applies, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

The PCR court addressed this claim as follows:

> Applicant alleged that Counsel should have objected to a portion of the testimony of Captain Jackie Kellett, witness for the State, as hearsay. Captain Kellett, when testifying about her conclusion regarding the match of a latent palm print to Applicant, indicated in her last statement on direct examination, that the conclusion "had been verified by a second latent print examiner in [her] office." After reviewing the testimony of Kellett, Counsel testified that he did not know why he did not object to that statement by Captain Kellett. However, he testified that there never was a dispute as to whose print it was, although he acknowledged that a bloody print in the car was one of the strongest pieces of evidence against his client and he should have objected to the statement. (PCR p. 27-8.)
>
> Kellett was qualified as an expert in latent fingerprint identification, but Counsel cross-examined her as to the procedure of comparing the prints to prints given to her by the local police of a suspect, as well as how a print in a substance might differ from that on a clean surface. This Court does not find that the brief statement affected the outcome of the trial, based upon the other evidence and testimony offered. Although counsel may have been deficient in his failure to object to this statement, this Court finds that the Applicant suffered no prejudice as a result of the alleged deficiency.

(R. at 914-15.)

The undersigned recommends granting summary judgment to Respondent as to Ground One. The state court's rejection of this claim of ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts. As the PCR court noted, Captain Kellett

concluded the palm print matched Petitioner, and counsel testified at the PCR hearing that there was never a dispute over "whose fingerprint it was." (R. at 800.) Indeed, Petitioner himself testified at his PCR hearing that he "didn't really have any question that [he] might of [sic] touched something [in the car] with blood on [his] hands." (R. at 868.) In light of this evidence, Petitioner is not entitled to federal habeas relief as to Ground One. *See Henh Chu Ngo v. Holloway*, 551 F. App'x 713, 715, 719 (4th Cir. 2014) (no habeas relief on petitioner's claim that counsel failed to object to Detective Ellis' hearsay testimony that Le identified the petitioner, "'a 'big person,' as [the decedent's] shooter and described the events surrounding the crime in a manner consistent with Le's testimony at trial" because the petitioner "failed to show that but for his trial counsel's failure to object, the outcome of either his direct appeal or his trial would have been different"); *Logan v. Gelb*, 790 F.3d 65, 71 (1st Cir. 2015) (no habeas relief on claim that counsel was ineffective in failing to object, on hearsay grounds, to social worker's testimony concerning victim's date of birth, stating, "Even if [the social worker's] testimony regarding [the victim's] date of birth had been excluded as a result of a successful objection by defense counsel—an issue we need not resolve here—[the petitioner] cannot show a reasonable probability that a hearsay objection to [the social worker's] testimony about [the victim's] date of birth would have changed the outcome of the trial.").

## B.    **Ground Two**

Petitioner asserts in Ground Two that counsel was ineffective in "fail[ing] to interview[] and secure for presentation at trial[] available witnesses whose testimony would have disputed key aspects of the State's case." (Dkt. No. 1-1 at 4 of 20.) Specifically, Petitioner points to three witnesses he contends that counsel should have interviewed and presented at trial: Amanda Murphy, Kenneth Scott, and Cynthia Thacker. (*See id*. at 4-11.) Petitioner states,

> ***Amanda*** could have refuted the alleged motive for Petitioner to want to kill the victim. The testimony of ***Thacker*** would have cast doubt as to several important details of Gentry's trial testimony. Trial Counsel was also ineffective for his failure to investigate what connection witness Annas had to the parties, and what motive he

11

may have had for lying for Gentry. The PCR testimony of *Scott* establishes that Annas's credibility and reliability could have been challenged in these areas at trial.

(*Id*. at 11.) The undersigned will address the witnesses in turn.

### 1. Amanda Murphy

Petitioner asserts counsel was ineffective in failing to interview and present Amanda Murphy as a witness at Petitioner's trial. (Dkt. No. 1-1 at 4 of 20.) Petitioner asserts that her testimony "would have directly refuted the contention of Brent Gentry that the deceased was killed by the Petitioner because he was "***messing with Amanda***." (*Id*. (emphasis in original).)

The PCR court addressed this claim as follows:

> The Applicant alleged that Counsel was ineffective for his failure to call several witnesses at trial[,] including[] Amanda Murphy. . . . Counsel testified that his investigator attempted to interview various witnesses provided by the Applicant, but the majority of those people were not cooperative. (PCR p. 25). Furthermore, near the close of trial, Counsel acknowledged that the court asked the Applicant about the fact that Counsel did not intend to call additional witnesses on his behalf and the Applicant acknowledged that he knew that and was in agreement with that decision. (PCR p. 56-7). . . .
>
> Counsel testified that he was aware of the Applicant's girlfriend, Amanda Murphy, as a potential witness; however, [he] testified that he did not interview her. Counsel testified that based on discovery materials, Counsel determined that Amanda would not be a good witness for the defense. (PCR p. 21). Counsel explained further that an issue occurred prior to trial where Amanda was accused of threatening a girl at Spartanburg Tech by saying she would "pull an Isaiah on her." (PCR p. 22). Counsel testified that Amanda had supposedly written these threats on the walls also at school. (PCR p. 44). Counsel testified that he did not want to risk bringing that issue or statement anywhere in the case and further testified that it was not an isolated statement or individual. (PCR p. 22). Counsel testified that he spoke with the State and although she had been listed as a State witness, the State agreed to not call Amanda as a witness. (PCR p. 22). Counsel testified that his recollection regarding the situation was that Amanda did not dispute writing threats on the wall. (PCR p. 60-1). In addition, Counsel testified that he also had information about the situation from the prosecutors and was under the belief that Amanda had spoken with them about the incident. (PCR p. 61).
>
> Counsel acknowledged sending a letter to the Applicant, in which he requested that Applicant not be in contact with Amanda because of the statements she was alleged to have made. (PCR p. 42-3). Applicant introduced the letter as Applicant's Exhibit #3. (PCR p. 46). Finally, Counsel testified that he did not believe

that Amanda offered anything of value to the case, but had the potential to hurt. (PCR p. 61).

Amanda testified at the hearing that she was never interviewed by either Counsel or anyone from his office prior to Applicant's trial. (PCR p. 69). Amanda testified that at the time of the shooting, she and the Applicant had been dating approximately eight months. (PCR p. 68-9). Amanda acknowledged that she had previously been arrested for simple possession, but the charge was dropped. Amanda's SLED record was introduced as Applicant's Exhibit #5. Amanda, when asked about the altercation with someone at school, testified that she could not even tell the name now, but then testified regarding the graffiti, that "[she] had no idea that any of that happened or [] had no idea that [she] did that." (PCR p. 70). Amanda also testified that she was never questioned by law enforcement about any statement or threats, but then testified that law enforcement did come to question her in Myrtle Beach, but claimed they did not listen because she was trying to support the Applicant. (PCR p. 71). Amanda further testified that she had never met the victim in this case, nor had she ever had any conversations with him on the phone. However, she did testify that she went to school with the victim's brother. (PCR p. 71-2.)

The Applicant testified that he talked with Counsel about his relationship with Amanda. Applicant also testified that Counsel asked him if there was anything between the victim and Amanda and Applicant testified that he was not aware of anything. (PCR p. 104). Applicant also testified that he made sure Counsel had Amanda's contact information. (PCR p. 105).

. . .

This Court has reviewed the testimony presented by each of the witnesses and finds Counsel's testimony to be more credible than Ms. Murphy's testimony. This Court finds that the testimony offered by Ms. Murphy was inconsistent and would not have affected the outcome of the trial. Ms. Murphy could only claim that she did not know nor did she have any interactions with the victim, but then also testified that she was aware that she went to school with the victim's brother. This Court believes that Counsel had a legitimate reason for not calling Ms. Murphy as a witness and recommending that his client refrain from communicating with her based on the allegations raised during her altercation with a girl at school. Although the Applicant offered Ms. Murphy's testimony at the hearing, this Court finds that he suffered no prejudice from counsel's strategic decision not to call her.

(R. at 908-13.)

The undersigned has carefully reviewed Ms. Murphy's PCR testimony and concludes that Petitioner is not entitled to habeas relief on this claim of ineffective assistance of counsel. Ms. Murphy testified as follows at the PCR hearing:

> Q. Okay. Now, you've heard testimony here today about an incident where you had a run-in with another young lady that was reported as an assault?

A. Yes.

Q. Who was that woman?

A. I couldn't even tell you her name.

Q. Okay. And did you subsequently become aware that she had reported graffiti on the school wall that threatened to pull an Isaiah on her?

A. I had no idea that any of that happened or I had no idea that I did that.

Q. Okay. Did you know anything about that until I questioned you about it?

A. No.

Q. And were you ever questioned by law enforcement about making any such statement to her?

A. No, I wasn't.

(R. at 843-44.)

Counsel testified that he did not interview Ms. Murphy because he made a "determination from discovery" that she "was not gonna be a good witness" for Petitioner. (R. at 794.) When asked what in the discovery led to that determination, counsel stated,

> Apparently she was up at Spartanburg Tech or wherever she went to school, and her and this girl gets in this argument, and she makes a statement to the extent that she's gonna pull an Isaiah on her, that, that–it was a statement that, that it implied that Isaiah had something to do with killing this guy, and that, and that–and I did not want her to come in here and do that. I did not want that statement anywhere in the case.

(R. at 795.) When asked whether he considered whether that statement "could [have] been characterized as puffery or making an id[le] threat to someone she didn't like," counsel stated,

> I would–that's–see, that statement was not isolated. And, so, I did not want to open the door to that statement coming in this case because it was not an isolated statement by an isolated individual, and, and, I got the State to commit to, to leaving her out of it. The State wanted to call her as a witness, and I was able to keep her out because it would, it would start up a line of testimony that I didn't think was favorable to us.

14

(R. at 795-96.) When asked whether he considered whether that testimony "could be characterized as hearsay and ruled inadmissible," counsel stated,

> It–well, she comes and testifies and says she said it, and then, you know, it's problematic. But if the witness comes to Court and she says yeah, I said it, and I, I understand that–that was a statement that had a lot more other stuff that was gonna be bootstrapped on it that, that it was just not gonna be good for Isaiah.
> Isaiah, I mean if she testifies and, if she's attacked, there's some more, there's some other stuff to be put on that I did not want to come in at this trial.

(R. at 796.)

Counsel testified that he did not call Ms. Murphy as a witness because of, *inter alia*, information in the discovery that indicated she had an altercation with a woman at Spartanburg Tech and that Ms. Murphy had threatened to "pull an Isaiah" on this woman. (R. at 795.) He also testified that there was "more, . . . other stuff to be put on that [he] did not want to come in at trial." (R. at 796.) The PCR court found counsel's testimony more credible than Ms. Murphy's, and Petitioner has not rebutted the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Wilson v. Ozmint*, 352 F.3d 847, 858 (4th Cir. 2003).

Furthermore, Ms. Murphy did *not* testify that she did not have an altercation with a woman at Spartanburg Tech. It is also not clear to the undersigned that Ms. Murphy denies threatening to "pull an Isaiah" on the woman. When asked about it, what she actually states is: "I had no idea that any of that happened or I had no idea that I did that." (R. at 843.) Ms. Murphy did not testify that there was no such graffiti on the wall.[2]

---

[2]In his Response in Opposition, Petitioner appears to assert that during the PCR hearing, counsel admitted that–contrary to his assertions in a letter to Petitioner–Ms. Murphy "had not given any written statements incriminating Petitioner." (Dkt. No. 25 at 6 of 26.) The letter to Petitioner states,

> Please find enclosed additional discovery I have received in your case. This includes statements from other witnesses. There are statements by your girlfriend attributing the murder to you. Please read all statements carefully. Do not contact your girlfriend and talk with her about her statement.

(R. at 901.) It is not clear to the undersigned that counsel "misled Petitioner about the fact that she had given statements attributing the murder to him." (Dkt. No. 25 at 8 of 26.) The undersigned does not read the letter to say that Ms. Murphy had given a *written* statement.

While the facts are not identical, the case of *Boseman v. Bazzle*, 364 F. App'x 796 (4th Cir. 2010), is instructive. In *Boseman*, the Fourth Circuit reversed the district court's grant of habeas relief on a claim that counsel was ineffective for failing to present witnesses in support of an alibi defense. *Boseman*, 364 F. App'x 796. The shooting at issue occurred between 9:30PM and 9:45PM. *Boseman*, 364 F. App'x at 798. In concluding that trial counsel's performance was deficient, "the district court first cited trial counsel's reliance on 'the Rickborn report, which stated that Walter and his college friends were with [the petitioner] from 8:30pm until 10:00pm.'" *Boseman*, 364 F. App'x at 808. The Fourth Circuit stated,

> [T]he Rickborn report does not say what the district court asserts that it says. The report, which summarizes Rickborn's interview with Walter in November 1996, states, in relevant part:
>
>> I asked Walter how he recalled that [sic] times of the evening that he was with Brian. He told me that he checked his watch on a regular basis that evening because even though he and his friends were partying they had to be back at S.C. State that evening. He looked at his watch when the client was dropped off at 8:30 p.m. because they were going to the store for more beer and he was keeping track of how much more time they had to drink beer. He knows that they left between 10:00 p.m.-10:30 p.m. because they were just going to have time to pick up some other S.C. State students who were at a party at Benedict College and get back to the S.C. State campus by 11:30 p.m.-12:00 a.m. (midnight).
>
> J.A. 792. Significantly, the Rickborn report does not state where Boseman was "dropped off" at 8:30 p.m. or what periods of time after 8:30 p.m. that Walter was actually with Boseman, if any.
>
> Boseman and the district court both assert the Rickborn report states that Boseman was dropped off at his house around 8:30 p.m. and that Walter, his friends, and Boseman were together from that point in time until Walter left between 10:00 and 10:30 p.m. An equally fair reading, if not a more compelling reading, of the report's actual language is that Walter was with Boseman for undefined periods of the evening, Boseman was dropped off at an undisclosed location at 8:30 p.m., and that Walter and his friends were either out buying beer or at the house until they left around 10:00 p.m. Where Boseman was during that time period is simply not determinable from the Rickborn report. The report does not set forth the straightforward complete alibi that the district court erroneously credits to it. Therefore, Boseman has failed to meet his burden under AEDPA that there was clear and convincing evidence that trial counsel misconstrued the nature of the potential alibi at the time he was deciding whether to present an alibi defense.

16

*Id.*

Similarly to *Boseman*, Ms. Murphy's testimony at the PCR hearing is far more equivocal that Petitioner suggests. The undersigned recommends granting summary judgment to Respondent as to this claim of ineffective assistance of counsel, as Petitioner has not met his burden under AEDPA to show he is entitled to relief. *See Boseman*, 364 F. App'x 796; *see also Jefferson v. Taylor*, 898 F.2d 145 (4th Cir. 1990) (unpublished table decision) (no habeas relief on claim that counsel was ineffective in failing to call a particular witness where, *inter alia*, the petitioner "failed to show that had this witness testified the result would have been different," and counsel's "choice not to call [the witness] appeared to be a reasoned and tactical one").

### 2. Kenneth Scott

Petitioner asserts that counsel was ineffective in failing to call Kenneth Scott as a witness, as Mr. Scott's testimony "would have been valuable to the defense" in that (a) "he testified that he had personally witnessed Annas trade his prescription medications for crack," and (b) he testified "that he had seen Annas trade his medications for crack *with the deceased* on several occasions." (Dkt. No. 1-1 at 7 of 20.) Petitioner contends that the "PCR testimony of *Scott* establishes that Annas' credibility and reliability could have been challenged . . . at trial" as to "what connection witness Annas had to the parties[] and what motive he may have hade for lying for Gentry." (*Id.* at 11 of 20.)

To understand this particular claim of ineffective assistance of counsel, a review of the testimony of Raymond Annas is necessary. Raymond Annas testified at trial that he had been acquainted with Petitioner for "[m]aybe a year and a half, two years max." (R. at 600-01.) Annas testified that he spoke to Petitioner on the telephone on February 17, 2006, the day the victim was shot. (R. at 601.) Annas testified that during his conversation with Petitioner, Petitioner "wanted

[Annas] to do him a favor," and Annas agreed. (R. at 601.) The following exchange occurred during

Annas' testimony:

> Q. And what kind of favor did [Petitioner] ask you to do?
>
> A. He was trying to get a drug transaction, and–
>
> Q. What kind of drug transaction?
>
> A. He was wanting to buy two pounds of marijuana.
>
> Q. And what was the price for it?
>
> A. And he told me that this–there was a fellow going to be calling me and just wanted me to tell him that yeah, he wanted two pounds of marijuana and that he would pay forty-seven hundred dollars ($4,700), forty-eight hundred ($4,800) if he delivered it.
>
> Q. All right. So, someone was supposed to call you and you were supposed to say, "I'm going to buy two pounds of dope for forty-seven hundred ($4,700)"?
>
> A. Forty-eight hundred dollars ($4,800) if it was delivered.
>
> Q. A hundred dollars ($100) more if he delivered it to you?
>
> A. Right.
>
> Q. And forty-seven if not?
>
> A. Right.

(R. at 601-02.)

Annas further testified that $4,700 was not a "reasonable" price for marijuana, as it was "too

high." (R. at 602.) Annas testified that, in fact, a male did call him and ask Annas what he wanted;

Annas "told him [he] wanted two pounds of marijuana." (R. at 603.) Annas however, indicated he

did not have $4,700 and did not think he was going "to be buying two pounds of dope." (R. at 604.)

Although Gentry testified that he did not know who Petitioner spoke with, Gentry testified that while

at the trailer, Petitioner went outside to talk on his cell phone, and when he came back inside,

Petitioner and the victim had a conversation about a "deal for some weed." (R. at 529.) According

to Gentry, Petitioner and the victim were going to buy two pounds of marijuana and resell it to someone else. (R. at 529-30.) Gentry testified that they did not "have the marijuana already." (R. at 530.)

Petitioner contends that counsel was ineffective in failing to call Mr. Scott as a witness because Scott's testimony "establishes that Annas' credibility and reliability could have been challenged . . . at trial" as to "what connection witness Annas had to the parties[] and what motive he may have had for lying for Gentry." (Dkt. No. 1-1 at 11 of 20.) The PCR court addressed this claim as follows:

> Kenneth Scott testified that he was 57, but knew the Applicant from the neighborhood. (PCR p. 76). Mr. Scott testified that he had no criminal convictions, but did have various traffic violations and a failure to pay child support. (PCR p. 77). Mr. Scott's SLED report was entered into evidence as Applicant's Exhibit #6. Mr. Scott testified that he knows Mr. Raymond Annus and has seen Mr. Annus trade his prescription medicine for crack cocaine numerous times. (PCR p. 78). Mr. Scott testified that he had never seen Mr. Annus complete any transactions with Brent Gentry or Chavez Miller, but he was able to say that he had seen Mr. Annus trade with the victim several times. (PCR p. 79). Mr. Scott testified that he would have been willing to speak with Counsel or his investigator, or testify at trial about the relationship between Mr. Annus and the victim. (PCR p. 79)).
> . . .
> As it relates to Mr. Scott, this Court does not find his testimony credible. The fact that out of the three names mentioned, Mr. Scott only testified that he knew Mr. Annus traded pills for drugs with the victim, rather than any of the others draws the credibility of his testimony into question, especially when the testimony was already presented that all of the names mentioned dealt in drugs. The testimony offered simply maligned the victim's character rather than offer any substantive support for the defense. While it is possible that Counsel could have asked Mr. Annus about his drug trading, testimony was already presented to indicate that Mr. Annus smoked marijuana and had purchased it on occasion. Therefore, this Court can find no prejudice in Counsel's failure to call Mr. Scott in an attempt to either malign the victim's character or in an attempt to attack the credibility of Mr. Annus.

(R. at 911-13.)[3]

---

[3]The PCR judge spells Mr. Annas' name as "Annus." (*See* R. at 911-13.) However, since the name is spelled "Annas" in the trial transcript, the undersigned uses that spelling herein. (*See* R. at 599-600.) "Annus" and "Annus" refer to the same individual.

19

As previously noted, factual findings on credibility are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1). The state court found Mr. Annas was not credible, and Petitioner has not rebutted the presumption of correctness by clear and convincing evidence. During cross-examination of Mr. Annas, the following exchange occurred:

> Q. And the type of people that we're dealing with here–well, first of all, you didn't know the second guy, right?
>
> A. No, sir.
>
> Q. The second guy is an unidentified guy, correct?
>
> A. I've never seen him and never, you know, talked to him in person.
>
> Q. And you didn't ask him for his phone number, his name, talk to him about his momma or anything?
>
> A. No, no.

(R. at 606.) It appears that counsel is asking Mr. Annas whether he knew the victim. Mr. Annas testified that he "didn't know the second guy," but Mr. Scott testified at the PCR hearing that he had seen Annas trade his medications for crack with the victim (the "second guy") on several occasions. (R. at 852.) However, Mr. Annas also testified that he did not ask the "second guy" for his name or phone number. (R. at 606.) In other words, it seems entirely plausible that Mr. Annas could have known the "second guy" but simply not been aware. Nor does the fact that Scott testified generally that Annas traded prescription medication for crack cocaine indicate that counsel was ineffective for failing to present Scott as a witness, as Mr. Annas admitted he had previously purchased marijuana. (R. at 602.)

The PCR court found that Petitioner failed to establish prejudice for counsel's failure to call Mr. Scott as a witness, (R. at 913), and in light of the foregoing, the undersigned concludes the state court reasonably applied *Strickland*. Petitioner is not entitled to habeas relief as to this claim of ineffective assistance of counsel.

20

### 3. Cynthia Thacker

Petitioner asserts that counsel was ineffective in failing to call Cynthia Thacker as a witness because her "testimony would have provided a chronology that was crucial to the Petitioner's defense." (Dkt. No. 1-1 at 9 of 20.) Thacker testified at the PCR hearing that on the morning of February 17, 2006, she was at the trailer along with Chavez Miller, Petitioner, Gentry, and the victim. (R. at 855.) Petitioner contends that Thacker's testimony "would have cast doubt as to several important details of Gentry's trial testimony." (Dkt. No. 1-1 at 11 of 20.) Petitioner states,

> Her PCR testimony confirms that she would have been able to present testimony which would have been valuable in that she confirmed that Petitioner and Gentry left *before* the victim; Jeffery Hubbard. In her PCR testimony, Thacker expressly stated that if Gentry testified that he did not see Chavez Miller that day, he was lying. . . . She confirmed that there was no time when the Petitioner and Gentry were at the trailer without the victim. Her testimony at trial would have established that Gentry arrived together with the Petitioner in a white car and would have confirmed that *they left together* while the victim was still there.

(*Id.* at 8-9 (emphasis in original).)[4]

The PCR court addressed this claim as follows:

> Counsel testified that he did not personally interview anyone who would have been present at the trailer, referenced to by Mr. Gentry; rather, his investigator met with and interviewed witnesses. (PCR p. 28). Counsel testified that he could not recall the name Cynthia Thacker, but the investigator talked with whoever was provided to Counsel as a potential witness. (PCR p. 28).
>
> Cynthia Thacker testified that she has known the Applicant since he was a child, but she also knows him from the Applicant visiting her. (PCR p. 82). Ms. Thacker testified that on the day the victim was killed, the Applicant, along with Sheryl Miller, Brent Gentry, and herself, were at the trailer, along with "Laddie," who owned the trailer. (PCR p. 82). Ms. Thacker testified that Jeffrey ("the victim") arrived first, with Applicant and Gentry coming several hours later. Then Ms. Thacker testified that the Applicant and Gentry left with the victim leaving soon after talking with Chavez Miller. Ms. Thacker denied that the Applicant ever stepped outside of the trailer to use the phone. (PCR p. 87). Ms. Thacker testified that she

---

[4]Chavez Miller did not testify at trial or the PCR hearing. Counsel testified at the PCR hearing that there was some evidence that Miller "had [come] to the [Petitioner's] home often and had taken [Petitioner's] clothes and wore them and never returned them." (R. at 796.) Counsel also testified that Miller gave a statement "that was not very good" for Petitioner, as Miller "gave a statement to law enforcement that [Petitioner] admitted he shot and killed the [victim]." (R. at 797-98.)

would have been willing to testify on behalf of the Applicant, had she been asked by Counsel. (PCR p. 84).

. . .

As it relates to Ms. Thacker, this Court finds her testimony to lack credibility. In addition to her criminal charges, testimony presented by the Applicant indicated that the people at the trailer were all smoking weed, which could call into question her ability to accurately recall the events six years earlier.

. . .

. . . [T]his Court finds that the testimony offered by each of the witnesses is not sufficient to establish prejudice from their failure to testify at trial. Therefore, this claim is denied and dismissed.

(R. at 911, 914.)

Petitioner is not entitled to habeas relief on this claim of ineffective assistance of counsel. The state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts. The state court found Ms. Thacker was not credible and stated reasons for so concluding. This factual finding is presumed to be correct, and Petitioner has not rebutted the presumption of correctness by clear and convincing evidence. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (noting that "federal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) ("[F]or a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear."). Because the state court's application of the *Strickland* claim was reasonable, Petitioner is not entitled to habeas relief on this claim. *See Harrington*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."); *see also Bell v. Persson*, 610 F. App'x 619, 620-21 (9th Cir. 2015) (affirming district court's denial of habeas relief, stating, *inter alia*, "[I]t was not unreasonable to find that witness Kevin Smith's post-conviction testimony was not credible. The circuit court's finding was based on the following factual findings: (1) Smith was biased in favor of Appellant; (2) Smith was angry about the length of Appellant's sentence; and (3) Smith would be impeached by his own prior inconsistent statements to police. The circuit court's conclusion—that

Appellant failed to satisfy the requirements of *Strickland*—was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." (internal quotation marks and citations omitted)). Accordingly, the undersigned recommends granting summary judgment to Respondent as to this claim of ineffective assistance of counsel.

## C.     **Ground Three**

In Ground Three, Petitioner asserts that trial counsel was ineffective in failing to "fully and accurately advise the Petitioner on the crucial decision concerning whether he should testify in his own defense at trial." (Dkt. No. 1-1 at 11 of 20.) Petitioner states, *inter alia*,

> The record below demonstrates that Trial counsel did not sufficiently advise his client concerning that decision. The Petitioner had no prior record with which he could have been impeached. The state had introduced evidence tending to prove that a palm print, in the victim's own blood, was found inside the victim's vehicle. Clothing and boots which could be tied to the Petitioner were found near the site where the victim's body was left in his car. **Absent testimony from the Petitioner**, there was nothing before the jury to explain this damning forensic evidence and the jury's only rational conclusion would necessarily be Petitioner's guilt of murder.

(Dkt. No. 1-1 at 12 of 20 (emphasis in original).)

The PCR court addressed this claim as follows:

> Counsel testified that he did discuss with Applicant his right to testify, but the Applicant indicated to Counsel that he did not want to testify. (PCR p. 13-4). Counsel testified that he talked with the Applicant about the fact that his testimony could be valuable, but also that his testimony did not reconcile with the evidence and could present a problem. Counsel testified that the story the Applicant told him regarding the [sic] Brent Gentry wearing Applicant's clothes and shooting the victim, but then Applicant going on his own to dispose the body and then, being afraid of, but later spending all day with Gentry, did not appear to make sense. (PCR p. 14). Additionally, Counsel testified that there were some issues regarding whether or not the victim may have shot a gun based on a shell that was found in the driveway, but then the victim had no gunshot residue on his hands. (PCR p. 15).
> Counsel also testified that at the time of the decision regarding the Applicant testifying, he talked with him some about being able to have the last argument, if no evidence was put up by the defense. (PCR p. 18). Counsel testified that it was never his strategy to not present any evidence in order to have the last argument, but the witnesses they had available to testify were risky and Counsel did not believe they would have been beneficial to the case. . . . Applicant introduced his criminal record, which indicated a simple possession of marijuana charge only, as Applicant's Exhibit #1. (PCR p. 18).

The Applicant testified that he never discussed with Counsel the fact of whether or not they could still put up evidence or witnesses for the defense even if the Applicant did not testify. (PCR p. 105). However, Applicant acknowledged that at the time of trial, when he informed the court that he agreed that he did not want to testify, he was just putting his trust in Counsel and "rolled with it, with the flow." (PCR p. 110).

This Court finds Counsel's testimony on this issue to be more credible than Applicant's testimony. This Court is not convinced that the Applicant wanted to testify on his behalf at trial or that Counsel never discussed with him the options of calling other witnesses, when that information is directly refuted by the record. It is clear that the Applicant was aware of his right to testify and this Court finds that he chose not to testify on his own accord, after discussing the options with Counsel. Additionally, this Court, after reviewing the testimony provided by the Applicant at the hearing, finds his explanation of the events of that day to lack credibility and to be rather unbelievable. In particular, the Applicant's claims that Mr. Gentry was wearing Applicant's clothes, but picked up the Applicant at the pond and then later returned to the pond where the car was to try and disposed [sic] of the clothes, Applicant's failure to explain the lack of blood in the Cadillac, and his description of how he disposed of his own clothes [sic]. (PCR p. 95-96; 112-3). This Court finds no deficiency and can find no prejudice as a result of any actions of Counsel. This Court does not believe that Counsel offered any incorrect advice to the Applicant regarding his right to testify or whether or not he should testify based upon the testimony presented at the hearing. Therefore, this claim is denied and dismissed.

(R. at 918-20.)

The PCR court specifically found–as to the claim set forth in Ground Three–that counsel's testimony was "more credible" than Petitioner's testimony. (R. at 919.) That court also made the factual finding that Petitioner "was aware of his right to testify" and "chose not to testify on his own accord, after discussing the options with Counsel." (R. at 920.) Such factual findings are "presumed to be correct"; Petitioner has the "burden of rebutting the presumption . . . by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Wilson v. Ozmint*, 352 F.3d 847, 858 (4th Cir. 2003); *cf. Wilson*, 352 F.3d at 860 ("These facts do not compel the credibility determination reached by the state court, but they certainly provide sufficient basis, for purposes of section 2254(d)(2), to support such a determination."). Petitioner has not done so.

Prior to a lunch break during trial, Judge Couch explained to Petitioner his right to testify; Judge Couch also explained that Petitioner had the right to remain silent and that if Petitioner chose

not to testify, Judge Couch would "instruct the jurors that they cannot give the fact that [Petitioner] did not testify any consideration whatsoever . . . ." (R. at 616-18.) Petitioner indicated that he understood his rights as explained by Judge Couch but that he wanted more time to discuss the matter with his attorney before making the decision. (R. at 618.) Judge Couch indicated that he would give Petitioner additional time to discuss the matter and would ask Petitioner after the lunch break whether or not Petitioner wished to testify. (R. at 618-19.)

When court reconvened after the lunch break, the following colloquy occurred:

THE COURT: All right. We're back on the record. Mr. Walker, I'm going to remind you that you are still under oath. You were placed under oath before our break. And, at that time, you and I had a discussion concerning your right to remain silent under the Fifth Amendment to the Constitution. Do you recall that discussion, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Now, do I need to go back over any part of that?

THE DEFENDANT: No, sir.

THE COURT: You understand that right?

THE DEFENDANT: Yes, sir.

THE COURT: Have you now had an opportunity to discuss this matter with both your attorney and family members or anyone else you wish to discuss it with?

THE DEFENDANT: Yes, sir.

THE COURT: And have you made a decision as to whether or not to testify?

THE DEFENDANT: Yes, sir.

THE COURT: Are you going to testify in the case?

THE DEFENDANT: No, sir.

. . .

THE COURT: Yes, sir. Mr. Walker, have you had an opportunity to discuss the presentation of additional evidence with your–with your attorney?

25

THE DEFENDANT: Yes, sir.

THE COURT: And have you completed that discussion?

THE DEFENDANT: Yes, sir.

THE COURT: Did your attorney answer all of your questions?

THE DEFENDANT: Yes, sir.

THE COURT: Go over everything you wish for both of your attorneys to go over; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: And are you satisfied with their representation at this point in time?

THE DEFENDANT: Yes, sir.

THE COURT: Your attorney has informed me that you do–that he does not intend to call additional witnesses. Do you understand that as well?

THE COURT: Yes, sir.

THE DEFENDANT: And do you agree with that decision?

THE COURT: Yes, sir.

(R. at 620-22.) Furthermore, counsel testified at the PCR hearing that Petitioner told him that he did not want to testify. (R. at 786.)

The state court found that Petitioner "chose not to testify on his own accord, after discussing the options with Counsel." (R. at 920.) Petitioner has not rebutted the presumption of correctness that attaches to the state court's factual findings by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) ("[F]or a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear."); *Fisher v. Lee*, 215 F.3d 438, 446 (4th Cir. 2000) ("Fisher has not shown that the state court findings are unreasonable, unsupported, or otherwise erroneous. Indeed, they are supported by competent evidence.").

The state court's rejection of this claim of ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts. In addition to the factual findings detailed above, the state court noted counsel's testimony that although Petitioner's testimony "could be valuable," "his testimony did not reconcile with the evidence and could present a problem." (R. at 919.) In addition, counsel testified that the "witnesses they had available to testify were risky and Counsel did not believe they would have been beneficial to the case." (R. at 919.) In light of the state court's factual findings and the evidence before the state court, the undersigned recommends concluding that Petitioner is not entitled to habeas relief as to Ground Three. The colloquy with the trial judge plainly supports the state court's determination that Petitioner made the decision not to testify, and as noted in *Carter v. Lee*, 283 F.3d 240 (4th Cir. 2002), "the advice provided by a criminal defense lawyer on whether his client should testify is "a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." *Carter*, 283 F.3d at 249 (internal quotation marks and citations omitted); *see also Harrison v. Moats*, 165 F.3d 911 (4th Cir. 1998) (unpublished table decision) (no habeas relief on claim that counsel "failed to adequately advise [the petitioner] of his right to testify in his own defense" where, *inter alia*, petitioner's counsel "testified that he informed [petitioner] of his right to testify and told him that it was his decision to make"); *Janke v. Novac*, 42 F. App'x 107, 110 (10th Cir. 2002) (rejecting claim that counsel was ineffective in failing to "advise [petitioner] adequately of his right to testify" where he failed to rebut the presumption of correctness as to the state court's finding that petitioner "was aware of his right to testify throughout his trial"); *Hodge v. Haeberlin*, 579 F.3d 627, 640 (6th Cir. 2009) ("Hodge's speculation that his testimony would have left a favorable impression with the jury does not demonstrate the required prejudice under *Strickland*.").

**D.**    **Ground Four**

Petitioner asserts in Ground Four that counsel was ineffective in failing "to convey to Petitioner, and fully discuss with him, two plea offers made by the State prior to trial." (Dkt. No. 1-1 at 14 of 20.) Petitioner testified at the PCR hearing that the only plea offer of which he was made aware was a plea to thirty years for manslaughter. (R. at 875.) He testified that he was never made aware of an offer for nineteen years or a possible deal for sixteen years. (R. at 876.) Petitioner contends that the state court overlooked his testimony that he "would of [sic] took the 16." (Dkt. No. 1-1 at 18 of 20; *see also* R. at 876.)

The PCR court addressed this claim as follows:

> Applicant alleged that Counsel was ineffective for failing to convey and discuss plea offers with him prior to and during the trial. Counsel testified that prior to trial, the State had offered to reduce the charge to voluntary manslaughter and then sometime subsequent to that offer, the State made an offer of nineteen years. However, Counsel testified that he could only find a letter in his file regarding the offer reducing the charge to voluntary. (PCR p. 7). Counsel testified that prior to trial he did convey the offers to his client. Counsel also testified that he specifically recalled reviewing with Applicant the fact that voluntary manslaughter would be an 85% sentence rather than day for day. (PCR p. 53). However, Counsel testified that the Applicant rejected both offers. (PCR p. 7-8). Counsel also testified that following the presentation of the State's case, upon Counsel's request, the State indicated that they would be willing to talk to the victim's family and consider sixteen years if the Applicant would commit to that at the time. Counsel testified that he shared that information with the Applicant and the Applicant did not want to commit to accepting a sixteen year offer. (PCR p. 8; 10-11). Counsel testified that the reasons the Applicant gave for not accepting any of the offers was that he did not shoot the victim and was not guilty of anything, but that Brent Gentry was the one who shot the victim. (PCR p. 12-3). However, Counsel did testify that the Applicant admitted to disposing of the body. (PCR p. 13).
> The Applicant testified that Counsel only relayed an offer of thirty years to him prior to trial and at first testified that he supposed it was for murder, but then stated that it was for manslaughter. (PCR p. 102). The Applicant testified that was the only offer he ever heard of from Counsel and that Counsel never came to him before trial with a nineteen year offer or during trial with a consideration for sixteen years. (PCR p. 102-3). Applicant testified that he would have taken the sixteen year consideration had he known about it during trial. (PCR p. 103). Applicant also testified that Counsel never reviewed with him the different [sic] between manslaughter being an 85% sentence versus murder being a day for day sentence.

The Applicant's mother, Elizabeth Walker, also testified that she was told of a plea offer for thirty years to the charge of murder by Counsel, but was never informed of any other plea offers. (PCR p. 116.) She also testified that after hearing the evidence presented at trial, if she had known there was a possibility for [a] sixteen year sentence for voluntary manslaughter, she would have encouraged her son to take that sentence. (PCR p. 117.)

The South Carolina Supreme Court has held that a case-by-case approach is appropriate for assessing "whether but for counsel's deficient performance a defendant would have accepted the State's proposed plea bargain and that he would have benefitted from the offer." Davie v. State, 381 S.C. 601, 613, 675 S.E.2d 416, 422 (2009). However, presumed prejudice is not appropriate and an Applicant must demonstrate actual prejudice. Id. (citing Nance v. Ozmint, 367 S.C. 547, 552, 626 S.E.2d 878, 880 (2006).

This Court finds Counsel's testimony as to the plea offers and the Applicant's subsequent rejection of the offers to be credible. This Court does not find Applicant's testimony credible that he would have accepted a lesser-offer had he known about it based upon his continued insistence as to his innocence of shooting the victim and only being involved in disposing of the body. This Court does not make any credibility findings as to the testimony of Applicant's mother because it is possible she was unaware of the plea offers closer to and during trial. This Court finds that the Applicant failed to offer credible testimony that Counsel failed to convey these plea offers to him. Furthermore, the Applicant specifically testified that between the option of finishing the trial or accepting a sixteen year offer, he "'probably'" would have taken the sixteen years instead of receive a life sentence. This Court finds that . . . the Applicant failed to offer sufficient evidence that even if there was a plea offer that Counsel failed to convey, that he would have accepted the offer. Therefore, this claim is denied and dismissed.

(R. at 920-22.)

The undersigned recommends granting summary judgment to Respondent as to Ground Four. "The Sixth Amendment right to the assistance of counsel during criminal proceedings extends to the plea-bargaining process." *Merzbacher v. Shearin*, 706 F.3d 356, 363 (4th Cir. 2013) (citing *Missouri v. Frye*, 132 S.Ct. 1399, 1405 (2012)). The test set forth in *Strickland* "governs ineffective assistance of counsel claims involving the plea process." *Id.* As set forth above, to prevail on an ineffective assistance of counsel claim, the Petitioner must establish (a) that counsel's performance was deficient, and (b) that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984).

> To show prejudice from ineffective assistance of counsel in a case involving a plea offer, petitioners must demonstrate a reasonable probability that (1) "they would have accepted the earlier plea offer had they been afforded effective assistance of counsel," and (2) "the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law."

*Merzbacher*, 706 F.3d at 366 (quoting *Frye*, 132 S.Ct. at 1409).

The state court found that counsel's testimony was credible "as to the plea offers and the [Petitioner's] subsequent rejection of the offers." (R. at 922.) Counsel testified at the PCR hearing that he conveyed the nineteen-year offer to Petitioner, and Petitioner rejected that offer. (R. at 780-81.) Counsel also testified that he told Petitioner that if he would "commit to voluntary manslaughter for 16," the solicitor "was willing to go to the family with that as a suggested offer." (R. at 783.) Counsel testified that Petitioner was not willing to commit to sixteen years. (R. at 784-85.) When asked what reason Petitioner gave for not being willing to plead to voluntary manslaughter, counsel testified that Petitioner indicated he "didn't do it" and "was not guilty of anything." (R. at 785.) The state court's factual finding on credibility is "presumed to be correct," Petitioner has the "burden of rebutting the presumption . . . by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Petitioner has not done so; the state court's findings are supported by a sufficient basis.[5] *See Wilson v. Ozmint*, 352 F.3d 847, 860 (4th Cir. 2003) ("These facts do not compel the credibility determination reached by the state court, but they certainly provide sufficient basis, for purposes of section 2254(d)(2), to support such a determination."); *Fisher v. Lee*, 215 F.3d 438, 446 (4th Cir. 2000) ("Fisher has not shown that the state court findings are unreasonable, unsupported, or otherwise erroneous. Indeed, they are supported by competent evidence."). Accordingly, the state court's rejection of this claim

---

[5]Petitioner focuses on the state court's notation that Petitioner testified he "probably" would have taken the sixteen years. However, the state court also recognized Petitioner's testimony that he "would have taken the sixteen year consideration had he known about it." (R. at 921.) The state court specifically found this testimony not credible for the following reason: Petitioner's "continued insistence as to his innocence of shooting the victim." (R. at 922.) The state court's factual finding that Petitioner's testimony "that he would have accepted a lesser-offer had he known about it" was not credible is supported by the evidence; accordingly, Petitioner has not shown that the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.

of ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts. *See Merzbacher*, 706 F.3d at 365-67 (reversing district court's grant of habeas relief on claim that counsel was ineffective in failing to convey a ten-year plea offer to him where "even if [the petitioner] did demonstrate that the state court was unreasonable in finding he did not receive deficient performance under *Strickland*, he did not demonstrate that the state court was unreasonable in finding it unlikely that *Strickland* prejudice resulted from this deficient performance," stating, "[I]t is entirely clear that to demonstrate a reasonable probability that he would have accepted a plea, a petitioner's testimony that he would have done so must be credible. . . . Accordingly, only if Merzbacher's testimony that he would have accepted the plea was deemed credible could *Frye* and *Lafler* assist him. The state court found this testimony not credible. Our close examination of the record and application of §§ 2254(d)(2) and 2254(e)(1) require us to defer to that finding."). Respondent is entitled to summary judgment on Ground Four.

**E.**    **Ground Five**

In Ground Five, Petitioner asserts that counsel was ineffective in failing to fully cross-examine his co-defendant Brent Gentry "concerning all of his pending charges[] and his sentencing exposure on those charges." (Dkt. No. 1-1 at 18 of 20.) Petitioner contends that counsel "failed to fully impeach the Petitioner's co-defendant concerning all the charges pending against him at the time of his testimony." (*Id*.)

The PCR court addressed this claim as follows:

> Applicant alleged that counsel was ineffective for failing to properly cross examine Brent Gentry during trial. Counsel testified that his main strategy was to throw the blame on Gentry, but there was no real evidence that Gentry was present at the house or actually shot the victim. (PCR p. 51). Counsel testified, as the transcript was reviewed, that he asked Gentry questions about the fact that he was in jail at the time of the trial and had been out on bond, but had done something to have that bond revoked. (PCR p. 36). Counsel also asked Gentry about potential animosity between himself and the victim, had Gentry admit that he carried a gun sometimes because of drug involvement, and that he occasionally sold drugs. (PCR p. 51-2).

Counsel further testified that he was able to get Gentry to say that he was hoping for his murder charge to be dismissed, even though he claimed nothing had been promised by the State. (PCR p. 36). Counsel also testified that he cross-examined Gentry regarding his testimony that when he showed up at Applicant's home, he saw no blood or evidence of the shooting, when the police found a great deal of blood and shell casings. (PCR p. 59.)

Counsel acknowledged receiving a copy of Gentry's SLED record in discovery, but did not recall why he did not ask additional questions as to what charge specifically caused Gentry's bond to be revoked. (PCR p. 37). Applicant's Counsel introduced Gentry's SLED record as Applicant's Exhibit #2. (PCR p. 40). Further, Counsel testified that he did not, but it would have been proper cross examination for him to ask Gentry about the pending murder charge, as well as the probation revocation proceeding for a four year drug charge that was pending. (PCR p. 38).

Counsel testified that he did not further cross-examine Gentry on his relationship with the Applicant, because although Gentry testified that he had seen the victim only a few times, but knew the Applicant for about ten years, the fact that Gentry had known the Applicant was [sic] about ten years was not disputed. Rather, Counsel testified that the Applicant knew Gentry and knew his reputations and even had some dealings with him, but did not consider Gentry a close friend. (PCR p. 65-6.) Counsel acknowledged that he did cross-examine Gentry on his relationship with Chavez Miller, but only did that because he received assurances from the State that they were not calling Chavez Miller as a witness. (PCR p. 66-7.)

. . .

The nature and scope of cross-examination is inherently a matter of trial tactics. United States v. Nersesian, 824 F.2d 1294, 1321 (2nd Cir. 1987). "[A] defendant has a 'burden of supplying sufficiently precise information,' of the evidence that would have been obtained had his counsel undertaken the desired investigation and of showing 'whether such information . . . would have produced a different result.'" United States v. Rodriguez, 53 F.3d 1439, 1449 (7th Cir. 1995).

Accordingly, the Applicant has not shown that a different approach to cross examination on [Brent Gentry] . . . would have been beneficial to the defense. The Applicant did not present any testimony showing the witnesses['] answers at trial would have been different. Moreover, this Court finds that the information presented by the Applicant was not sufficient to have altered the outcome of Applicant's trial had it been presented. Therefore, this claim is denied and dismissed.

(R. at 915-18.)

The undersigned recommends granting summary judgment to Respondent as to Ground Five. During cross-examination of Gentry, counsel got Gentry to admit that while he was out on bond for the murder charge, he "did something to get [himself] back in jail." (R. at 561.) Additionally, counsel got Gentry to admit that he was "expecting" his murder charge "to be dropped." (R. at 562.) The following is an excerpt from Gentry's cross-examination:

Q. Okay. And–and, in fact, you believe that it's in your best interest to testify, correct?

A. I would think so, yeah.

Q. Okay. And–and, so, to be in your best interest, you have to feel like you're getting something out of it, correct?

A. Not necessarily, but yeah, yes, sir.

Q. Okay. So, this notion about I ain't getting nothing, been promised and stuff, you don't believe that because you're expecting something, correct?

A. But nothing was promised.

Q. But you're expecting it, correct?

A. Yeah, expecting my charge to be dropped.

Q. Okay. You're expecting it. So, you expect that the charge would be dropped against you and Mr. Walker convicted; that's the plan, correct?

A. I don't know, if he's going to get convicted or not, but I expect my charge to be dropped.

Q. Okay. All right. And that's the basis of this testimony, correct?

A. Yes, sir.

(R. at 562.) Additionally, when asked for the trial date of his murder charge, Gentry stated, "I don't know." (R. at 571.) Gentry also admitted that (a) he had a conviction for selling drugs near a school, and (b) he had carried a gun in the past because selling drugs is dangerous. (R. at 557-58.)

The state court's rejection of this ineffective assistance of counsel claim does not warrant federal habeas relief. Counsel had Gentry admit that he hoped his murder charge would be dismissed after his testimony and admit that while he was out on bond for the murder charge, he "did something to get [himself] back in jail." (R. at 561.) Given that Gentry was charged with murder and back in jail because he had his bond revoked for doing "something to get [himself] back in jail," and that the jury heard Gentry had a conviction for selling drugs near a school, the state court's conclusion that

counsel was not ineffective is not an unreasonable application of *Strickland*. *See Hoots v. Allsbrook*, 785 F.2d 1214, 1221 (4th Cir. 1986) (no habeas relief where counsel failed to impeach witness who "had been arrested and convicted on numerous worthless check charges, and had two felony arrests for forgery that had resulted in misdemeanor convictions for obtaining goods with worthless checks," stating, "Had [the witness] been convicted of perjury or another crime that directly called into question the reliability of her testimony, we might find that [petitioner] had shown a reasonable probability that but for the failure to impeach, the outcome of the trial would have been different. The failure to use worthless check convictions to impeach [the witness] does not give rise to a comparable implication of [the witness'] testimonial untrustworthiness, however."); *Goins v. Angelone*, 52 F. Supp. 2d 638, 653 (E.D. Va. 1999) (no habeas relief on claim that counsel failed to investigate the potential for impeaching witness where, "[e]ven without undertaking the relevant investigation, trial counsel were able to locate and introduce evidence that there were no fares recorded for [the witness'] cab substantiating his testimony that he had picked up [petitioner] at the times alleged. Counsel were thus able to argue to the jury that either [the witness] had not picked up [petitioner] at the times alleged or he had picked up [petitioner], but lied to his cab company. Through this evidence, counsel *were* able to cast some doubt upon [the witness'] testimony and trustworthiness. In addition, there is no reasonable probability that if counsel had been able to impeach [the witness] with evidence of his criminal activity, [petitioner] would not have been convicted. Evidence of participation in drug trafficking or embezzlement would not have directly implicated [the witness'] testimonial trustworthiness, as would, for instance, a perjury conviction"). The undersigned therefore recommends granting summary judgment to Respondent on Ground Five.

## CONCLUSION

It is RECOMMENDED, for the foregoing reasons, that Respondent's Motion for Summary Judgment (Dkt. No. 14) be GRANTED; and the Petitioner's habeas petition be DISMISSED WITH PREJUDICE. It is further RECOMMENDED that a certificate of appealability be denied.[6]

IT IS SO RECOMMENDED.

_Mary Gordon Baker_

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

June 21, 2016
Charleston, South Carolina

**The parties' attention is directed to the important notice on the next page.**

---

[6]Title 28, Section 2253 provides in relevant part,
(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
(B) the final order in a proceeding under section 2255.
28 U.S.C. § 2253. A prisoner satisfies this standard by demonstrating that reasonable jurists would find this court's assessment of his constitutional claims debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001). In the case *sub judice*, the legal standard for a certificate of appealability has not been met. The undersigned therefore recommends that a certificate of appealability be denied.

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).